UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                         :

RECLAIM THE RECORDS et al.,                :

                               :

                  Plaintiffs,         :

                               :               23-CV-1471 (JMF)

        -v-                       :

                               :          OPINION AND ORDER

UNITED STATES DEPARTMENT OF STATE,   :

                               :

                  Defendant.      :

                               :

---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Alec Ferretti is a board member of Reclaim the Records, a non-profit organization that acquires genealogical data sets from government sources for the purpose of making them free and accessible to the public. *See* ECF No. 1 ("Compl."), ¶ 6. In 2017, Ferretti and Reclaim the Records (together, "Plaintiffs") submitted a request for a "copy of the index to all birth and death records held by the State Department for the Panama Canal Zone" under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.* Compl. ¶ 9. The Department of State (the "Department") failed to promptly process the request, and this action followed; thereafter, the Department denied the request on the ground that the record requested by Plaintiffs does not exist. *See id.* ¶¶ 5, 24-25; ECF No. 12, at 1. The parties' dispute — presented by way of cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, *see* ECF Nos. 21, 35 — turns on whether the index Plaintiffs seek can be generated from preexisting data held by the Department. For the reasons that follow, the Court concludes that the Department has the better of the argument. Accordingly, its motion for summary judgment is GRANTED and Plaintiffs' cross-motion for summary judgment is DENIED.

## BACKGROUND

The following facts, which are undisputed unless otherwise indicated, derive from the sworn declarations of Regina L. Ballard, Division Chief of the Office of Records Management within the Department's Bureau of Consular Affairs, *see* ECF No. 22 ("Ballard Decl."), ECF No. 46 ("Ballard 2d Decl."), and Sharon Westmark, Division Chief of the Production Services Design and Development Division within the Bureau of Consular Affairs, *see* ECF No. 47 ("Westmark Decl."), submitted in support of the Department's motion for summary judgment, among other evidence submitted by the parties. Courts treat such declarations with "a presumption of good faith," *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994), to the extent "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith," *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999).

### A. Panama Canal Zone Birth and Death Records

In 1999, the Panama Canal Commission transferred to the Department birth and death records for the Panama Canal Zone ("PCZ"), an area of Panama controlled by the United States between 1903 and 1979. *See* Ballard Decl. ¶ 10. The Department primarily maintains these records as "paper records" in sixty-eight boxes containing 95,200 index cards. *Id.* ¶¶ 11-12. Although the Department "attempted to import some of the PCZ data" to the Passport Information Electronic Records System ("PIERS") as part of a wider effort to digitize passport records, the resulting data was "of such poor quality that the Department abandoned the effort and decided to preserve them in their paper form instead." *Id.* ¶ 21. As a result, there is "an imperfect match of the data in PIERS and the paper records for the PCZ birth records and the PCZ death records," Ballard 2d Decl. ¶ 17, and the 95,200 paper index cards constitute the Department's "official birth and death records for the PCZ," Westmark Decl. ¶ 13.

To locate a specific PCZ birth or death record, a Department employee starts by entering the relevant name, date of birth, and file type (e.g., birth or death record) in PIERS.  Ballard 2d Decl. ¶ 18; Westmark Decl. ¶ 11.  The PIERS application then queries multiple, separate databases for "all relevant PRISM file numbers," which are unique numbers assigned to each image of a digitized document.  *Id.* ¶ 12.  Because there is a "unique PRISM number for each scanned document, . . . there could be multiple PRISM numbers associated with a recordholder," and a search could produce multiple results.  *Id.* ¶ 13.  When the employee attempts to retrieve the scanned record associated with a particular PRISM number, "the PIERS application code on the backend searches the relevant file shares[] to retrieve the image of," in this case, "the PCZ birth or death record."  *Id.* ¶ 12.  But because the digital data is incomplete, the Department is "unable to validate the accuracy of" the results generated by the PIERS application and must ultimately rely on the paper index cards "as its official birth and death records for the PCZ," *id.* ¶ 13.  Therefore, even if a Department employee is able to identify "the corresponding entry in PIERS" for a PCZ birth or death record, the employee must "undertake a lengthy process to ensure that the information in PIERS matches" the information in the paper record for the individual in question.  Ballard 2d Decl. ¶ 22.  If the employee is unable to locate the record in PIERS, the employee can only identify the corresponding paper record by going through the boxes of index cards or "book volumes" of those same records.  *Id.* ¶¶ 23-24, 26.  Neither the boxes nor the book volumes contain any "index or list for the PCZ records."  *Id.* ¶¶ 25, 27.

Because PIERS utilizes multiple databases "housing different aspects of . . . information," a "database quer[y]" for a comprehensive list of the relevant PCZ birth and death records would "generate unreliable data that Department personnel would have to separately validate."  Westmark Decl. ¶ 14.  The Department has never extracted such a comprehensive list

from PIERS. Ballard Decl. ¶ 26. Indeed, according to Ballard, "[u]ndertaking this exercise . . . would take years to complete," as an "IT specialist would have to do a bulk pull of this information and then a Department Passport analyst would need to verify that the data pulled matched the actual information in the digitized record" and confirm that the information could be released in accordance with the Privacy Act. *Id.* "[A]n inventory of the Department's PCZ records . . . derived from the [95,200] paper index cards" would similarly "take a Department employee several years to complete." Westmark Decl. ¶¶ 13-14; Ballard Decl ¶ 19.

**B. Plaintiffs' FOIA Request**

On June 30, 2017, Plaintiffs submitted a FOIA request for "a copy of the *index* to all birth and death records held by the State Department for the Panama Canal Zone." ECF No. 36-1, at 1. In a letter to the Department, Ferretti explained that a "vital records index is typically the document either contained at the end of a book of vital records, or in a separate volume, alphabetically listing all vital events which took place in a jurisdiction during a specified time period, usually organized by surname or in sequential order." *Id.* Ferretti also explained that "[t]hese indexes have often been digitized in a searchable database format" and requested that "this index be sent to [him] digitally, in a searchable database format, if such database exists." *Id.* at 1-2. Significantly, Plaintiffs did not request, and do *not* seek here, "the release of any actual birth or death certificates that were indexed." ECF No. 42 ("Pls.' Opp'n"), at 1.

Although the Department acknowledged the request on August 23, 2017, *see* ECF No. 36-2, it failed to act on the request for years, *see* ECF Nos. 36-3, 36-4, 36-5, 36-6. In May 2021, the Department stated, in response to Ferretti's fifth request for a status update, that the FOIA request was in process and the estimated date of completion was February 14, 2022. *See* ECF No. 36-7. The next month, a Department FOIA Analyst e-mailed Ferretti stating that it was

"very difficult to process [Plaintiffs'] request" and seeking clarification as to the range of years covering the PCZ birth and death records sought. ECF No. 36-8. In reply, Ferretti referred the Department analyst to a Department records disposition schedule from 2021, which specifies that the Department is in possession of an "Index of Panama Canal Zone Birth Certificates, adoption records and related documents for persons born between 1904 and 1979" and an "Index of Panama Canal Zone Death Certificates for persons who died between 1904 and 1979." *See id.*; *see also* ECF Nos. 1-8, 22-2. According to the Department, these entries refer to the sixty-eight boxes of index cards constituting the Department's "official" PCZ birth and death records, not a separate index of those cards. *See* Ballard Decl. ¶¶ 14-15; Ballard 2d Decl. ¶ 29.

On February 2, 2023, over five and a half years after Plaintiffs' filed their FOIA request, Plaintiffs filed this action seeking review of the Department's failure to promptly release the requested records under 5 U.S.C. ¶ 552(a)(4)(b). *See* Compl. ¶¶ 1-2, 3, 5. Two months later, in a letter dated April 13, 2023, the Department informed Ferretti that it had "conducted searches and found no responsive records" and that "that complete[d] the processing of [Plaintiffs'] request." ECF No. 22-4. More specifically, the Department explained as follows:

> [T]he Department does not maintain an index or search aid for birth and death records for the Panama Canal Zone. The system where these birth and death records are stored does not contain an index or spreadsheet or allow for the extraction and compilation of certain information from the records stored in the system. Rather, the Department can only retrieve the records stored in the system manually and one-at-a-time, meaning that the Department must search the system using personally identifiable information, including the name and date of birth of an individual, to locate a particular birth or death record for the Panama Canal Zone.

*Id.* According to Ballard, the Department had "searched for *any* index or list that could serve as a search aid for PCZ birth and/or death records," with and "without restriction as to the date of such records, . . . [and] regardless of whether any index or list would refer to these records separately or in a combined fashion." Ballard 2d Decl. ¶¶ 7, 9. Ballard also spoke with

personnel in the Office of Consular Systems and Technology, the Office of Modernization and Systems Liaison, and Passport Services to determine whether any such index or list exists or "could be extracted from Department systems or databases." *Id.* ¶¶ 12-13.

In challenging the Department's denial, Plaintiffs point to a Department records disposition schedule, which includes one entry described as "Index of Panama Canal Zone Birth Certificates, adoption records and related documents for persons born between 1904 and 1979 in the Panama Canal Zone or in hospitals administered by the U.S. Government in Panama City and Colon" and another described as "Index of Panama Canal Zone Death Certificates for persons who died between 1904 and 1979 in the Panama Canal Zone or in hospitals administered by the U.S. Government in Panama City and Colon." ECF No. 22-2, at 13. Both entries are described as "Index Card File." *Id.* Plaintiffs also point to an excerpt from the Federal Register stating that the Department "maintains U.S. passport records for passports issued from 1925 to present, as well as vital records related to births abroad, deaths, and witnesses to marriage abroad." ECF No. 22-3, at 1. Among the categories of records included in the passport records system, it lists "Panama Canal Zone birth certificates and death certificates" and "[a]n electronic index of Department of State Reports of Birth of American Citizens abroad," among the categories of records included in the passport records system. *Id.* at 1-2. It notes that these records are stored by "[h]ard copy and electronic media." *Id.* at 3. Finally, they cite the Department's 2020 "Privacy Impact Assessment" of PIERS, which contains a section describing how information in the database can be shared. *See* ECF No. 36-9, at 7-9.

On October 24, 2023, the Department filed its motion for summary judgment. ECF No. 21. Plaintiffs filed their cross-motion on February 19, 2024. ECF No. 35. After the Court granted multiple extensions, the motions became fully briefed on August 2, 2024.

## LEGAL STANDARDS

Congress's purpose in enacting FOIA was "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *Open Soc'y Just. Initiative v. Dep't of Def.*, No. 20-CV-5096 (JMF), 2021 WL 3038528, at *3 (S.D.N.Y. July 15, 2021) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). "FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Further, "all doubts [are to be] resolved in favor of disclosure," *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988). Significantly, however, "FOIA imposes no duty on [an] agency to create records." *Forsham v. Harris*, 445 U.S. 169, 186 (1980). It requires an agency only to "disclose[] existing documents, which it has already prepared." *Pierce & Stevens Chem. Corp. v. U.S. Consumer Prod. Safety Comm'n*, 585 F.2d 1382, 1388 (2d Cir. 1978).

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved." *Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 604 (S.D.N.Y. 2018). In general, summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where both sides move for summary judgment, as here, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose

motion is under consideration." *Id*. To defeat a motion for summary judgment, the non-moving

party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and

demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot

defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or

on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of*

*Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

    More specifically, in order for an agency to prevail on a motion for summary judgment in

a FOIA case, it must fulfill the "burden of showing that its search [for the requested record or

records] was adequate." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). An

agency may satisfy that burden by submitting declarations that recite "facts which enable the

District Court to satisfy itself that all appropriate files have been searched." *Jones-Edwards v.*

*Appeal Bd. of Nat. Sec. Agency Cent. Sec. Agency*, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005),

*aff'd* 196 F. App'x 36 (2d Cir. 2006) (summary order) (quoting *Church of Scientology v. IRS*,

792 F.2d 146, 151 (D.C. Cir. 1986), *aff'd,* 484 U.S. 9 (1987)). Such declarations must "describe

the justifications for nondisclosure with reasonably specific detail," *Knight First Amend. Inst. at*

*Columbia Univ. v. USCIS*, 30 F.4th 318, 327 (2d Cir. 2022), so as to "afford the FOIA requester

a meaningful opportunity to contest, and the district court an adequate foundation to review, the

soundness of" the agency's determination, *Seife*, 298 F. Supp. 3d at 606 (quoting *Campbell v.*

*U.S. Dep't of Just.,* 164 F.3d 20, 30 (D.C. Cir. 1998)); *see also Halpern v. F.B.I.,* 181 F.3d 279,

293 (2d Cir. 1999) ("[B]lind deference is precisely what Congress rejected when it amended

FOIA in 1974.").

At the same time, the agency's "search for responsive documents need not, and indeed could not be perfect," and a search may be "reasonable and adequate even if it fails to produce all relevant material." *Garcia v. U.S. Dep't of Just.*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002) (cleaned up). Furthermore, "[i]t is clear beyond cavil that an agency cannot improperly withhold records that it does not maintain," which means that "'where the Government's declarations establish that a search would be futile, the reasonable search required by FOIA may be no search at all.'" *Whitaker v. Department of Commerce*, 970 F.3d 200, 207 (2d Cir. 2020) (quoting *MacLeod v. United States Department of Homeland Security*, No. 15-CV-1792 (KBJ), 2017 WL 4220398, at *11 (D.D.C. Sept. 21, 2017)). In sum, "[t]he agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Garcia*, 181 F. Supp. 2d at 368 (internal quotation marks omitted). The key is whether the agency's "search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *Grand Cent. P'ship Inc.*, 166 F.3d at 489 (quoting *SafeCard Servs., Inc. v. S.E.C.,* 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

"When an agency has satisfied its 'burden of showing that its search was adequate . . ,' a plaintiff seeking to avoid an award of summary judgment to the [agency] must show either bad faith sufficient to 'impugn the agency's affidavits' or 'provide some tangible evidence that . . . summary judgment is otherwise inappropriate.'" *ACLU Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 651 (2d Cir. 2023) (quoting *Carney*, 19 F.3d at 812); *Triestman v. U.S. Dep't of Just.,* 878 F. Supp. 667, 672 (S.D.N.Y. 1995) (explaining that if the agency's affidavits are adequate on their face, summary judgment should be granted "only if the plaintiff makes a showing of bad faith sufficient to impugn the affidavits . . . based on more than mere

speculation).  "Affidavits submitted by an agency are 'accorded a presumption of good faith.'"

*Carney,* 19 F.3d at 812 (quoting *Safecard Servs., Inc.*, 926 F.2d at 1200).

### DISCUSSION

Applying these standards here, the Court concludes that the Department has satisfied its

burden.  Ballard's and Westmark's declarations set forth in "reasonably specific detail," *Knight*

*First Amend. Inst.*, 30 F.4th at 327, both that the Department conducted an adequate search for

any preexisting or readily available indexes and lists and that fulfilling Plaintiffs' request would

require the creation of new records.  Plaintiffs fail to rebut the presumption of good faith owed to

these representations.  The Department is therefore entitled to summary judgment.

**A.  The Department's Search Was Adequate**

To begin, Ballard's and Westmark's declarations leave no genuine dispute that "all

appropriate files have been searched."  *Jones-Edwards*, 352 F. Supp. 2d at 423.  Contrary to

Plaintiffs' argument that the Department "rel[ied] on a narrow definition of 'index'" in

conducting its search, Pls.' Opp'n 11, the Department "searched for *any* index or list that could

serve as a search aid for PCZ birth and/or death records," with and "without restriction as to the

date of such records, . . . [and] regardless of whether any index or list would refer to these

records separately or in a combined fashion," Ballard 2d Decl. ¶¶ 7, 9.  Importantly, the

Department searched for any already-existing "index" in both the sixty-eight boxes of hard-copy

records and in the partially complete collection of PCZ birth and death records in PIERS — the

two places most likely to hold records responsive to Plaintiffs' request — and confirmed that

there is no "separate list or index of [the] records."  Ballard Decl. ¶ 18; *see also id.* ¶ 25.  Finally,

Ballard —who, as the Division Chief of the Office of Records Management within the

Department's Bureau of Consular Affairs, is a reliable, if not authoritative, source on "the

archiving and retrieval of [the] records" at issue, Ballard Decl. ¶¶ 1, 3 — consulted others familiar with Department systems and databases and confirmed that "the Department does not maintain any index or list of PCZ birth or death records," Ballard 2d Decl. ¶ 13. These descriptions exceed the "minimal detail" that Plaintiffs accuse the Department of providing, Pls.' Opp'n 9, and they demonstrate that the Department conducted "a search reasonably designed to identify and locate responsive documents," *Garcia*, 181 F. Supp. 2d at 368 (internal quotation marks omitted), including by going beyond "the context of an already-existing document" and contemplating the possibility of "responsive data extracted via a database query," ECF No. 52 ("Pls.' Reply"), at 3.

Plaintiffs do not really challenge the Department's representation that it conducted an adequate search for "an already-existing aid which would guide a Department employee to where among [the sixty-eight] boxes to look for a particular record (i.e., an index)." Pls.' Opp'n 17. Instead, relying primarily on a declaration from a purported database expert, Ron Schnell, they maintain that the Department can search PIERS "for the names and dates of birth of individuals born in the Panama Canal Zone between 1904 and 1979, and the names and dates of death of individuals who died in the Panama Canal Zone between 1904 and 1979, any additional data relevant to the particular individual's vital record (for example, certificate number), and that the data resulting from these searches be provided in a searchable database format." *Id.* at 17-18; *see id.* at 18 ("The personally identifying information fields maintained by Department database can be used in a search query to generate the requested information."); ECF No. 41 ("Schnell Decl."). More specifically, they contend that "[a]n associative relationship between PCZ data and individual [personally identifiable information] strongly implies the ability of a PIERS user with back-end database access to use database search queries and programming to generate and

extract a list of the names of the individuals those PCZ records concern." Pls.' Reply 2. "If the Department is able to locate an individual record within the tens of thousands of records it maintains from the PCZ," the argument goes, "an index of some type would seem necessary to correlate the index cards to corresponding records in digital form which are apparently part of the database." Pls.' Opp'n 12-13. These arguments are not enough to carry the day.

For starters, it is doubtful that the Court should even consider Schnell's declaration. First, "the adequacy of a federal agency's search for documents in response to a FOIA request is not [usually] a topic on which [the Court] needs the assistance of an expert." *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 141 n.10 (D.D.C. 2015) (Jackson, J.); *see also Hall v. Cent. Intel. Agency*, 538 F. Supp. 2d 64, 72-73 (D.D.C. 2008) ("[T]he Federal Rules of Evidence and Federal Rules of Civil Procedure do not permit testimony to be introduced *carte blanche* merely because they are offered by an expert."). And even if it were, Schnell "is not a [Department] employee, and [] does not aver that he has ever worked at . . . the [Department]." *Bigwood*, 132 F. Supp. 3d at 141 n.10; *see* Schnell Decl. ¶¶ 2-8. As a result, Schnell's understanding of the record-keeping system relevant to this case concededly stems entirely from Ballard's declarations, *see id.* ¶ 21; *see also* Pls.' Reply 7, and his declaration is limited to broad assertions about "[a]ll modern databases" and what he "would expect someone with direct database access" to do when faced with a FOIA request like Plaintiffs', *id.* ¶¶ 19, 23. This makes it unlikely that Schnell's declaration "reflects a reliable application of the principle and methods to the *facts of the case.*" Fed. R. Evid. 702(d) (emphasis added); *see Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case." (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993)); *see also In't Veld v. Dep't of Homeland Sec.*,

589 F. Supp. 2d 16, 21 (D.D.C. 2018) (rejecting an expert affidavit that "is based on the faulty assumption that [all] systems are the same"); *cf. Osen LLC v. U.S. Cent. Command*, 375 F. Supp. 3d 409, 421 (S.D.N.Y. 2019) (declining to extrapolate from Plaintiffs' experts' discussions of specific disclosures), *rev'd on other grounds*, 969 F.3d 102 (2d Cir. 2020).

But even if the Court could properly consider Schnell's declaration, the declaration fails to sufficiently counter Ballard's and Westmark's detailed technical explanations of the ways in which PIERS is "unlike . . . a typical database," ECF No. 45 ("Def.'s Reply"), at 12, and how, as a result, it does not contain and cannot generate "records responsive to Plaintiff[s'] FOIA request," Ballard Decl. ¶ 4. Indeed, for the most part, Schnell provides "generalities about technical capabilities of generic systems," which is not enough to overcome an agency's detailed declarations "as to the technical feasibility and reproducibility of a records request." *Long v. Immigr. & Customs Enf't*, 149 F. Supp. 3d 39, 57-58 (D.D.C. 2015). In the only paragraph of his declaration that engages with Ballard's description of the PIERS system with some specificity, Schnell emphasizes that Ballard "admits that the PIERS system interacts with the database using the personal identifying information fields that are necessary to fulfill this FOIA request ('name,' 'date of birth[,'] etc.)," and argues that "the fact . . . that PIERS can use these fields shows that . . . [they] can be used in a simple query" to generate indexes. Schnell Decl. ¶ 27 (discussing Ballard Decl. ¶ 23). But, as discussed above, Ballard and Westmark adequately explain why the PIERS application's responsiveness to those fields is not enough to generate an index. First, running a search on the PIERS application with those fields could retrieve "multiple PRISM numbers" for record-holders with more than one digitized passport record. Westmark Decl. ¶ 13. In those cases, the search process would then require human input to choose the correct PRISM number and "validate any data from PRISM file numbers." *Id.* Second, a search entails at least

two steps: when, after the initial search on the PIERS application, the Department employee attempts to retrieve a particular scanned record associated with a particular PRISM number, "the PIERS application code on the backend searches the relevant file shares/databases to retrieve the image of," in this case, "the PCZ birth or death record." *Id.* ¶ 12.  Schnell's broad assertion that even "data . . . spread between tables or even databases . . . would be reflected in the actual search queries" does not account for this multi-step process at all.  Schnell Decl. ¶ 25.

In the absence of more specific challenges to Ballard's and Westmark's descriptions of the Department's record-keeping system, Ballard's and Westmark's declarations are enough to establish that an index is not readily available and that a further "search" for one through the PIERS application "would be futile." *Whitaker*, 970 F.3d at 207.  In other words, the Department does not maintain either a preexisting index or list of the relevant birth and death records.  Nor does it have the kind of data management system that enables the generation of such an index or list on demand.  It follows that the Department "cannot improperly withhold" the requested records.  *Id.*; *see also Garcia*, 181 F. Supp. 2d at 368 ("The agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." (internal quotation marks omitted)).

## B.  The Department Is Not Required to Create a New Record

That is enough to resolve this case.  But the record also makes plain that the only way to satisfy Plaintiffs' request would be to "create" a record that does not exist, which, as noted, FOIA does not require.  *See Forsham*, 445 U.S. at 186.  Notably, some courts have deemed the production of "a list of records returned from [a] . . . search" on an agency database — such as the Public Access to Court Electronic Records (or PACER) system — "something that FOIA

does not mandate" because it "would be tantamount to requiring [the agency] to *create* [a] record." *People for Am. Way Fdn. v. U.S. Dep't of Just.*, 451 F. Supp. 2d 6, 15 (D.D.C. 2006); *see also Johnson v. Cent. Intel. Agency*, 330 F. Supp. 3d 628, 643 (D. Mass. 2018) ("[A]n agency is not compelled to create a new list for a requester."); *Nat'l Sec. Counselors v. Cent. Intel. Agency*, 898 F. Supp. 2d 233, 271 (D.D.C. 2012) ("[A] FOIA request for a listing or index of a database's contents that does not seek the contents of the database, but instead essentially seeks information about those contents, is a request that requires the creation of a new record, insofar as the agency has not previously created and retained such a listing or index.").  Applying that logic here, Plaintiffs' case would arguably have ended as soon as Ballard's and Westmark's declarations established that the Department could not find any already-existing "index" in either the sixty-eight boxes of hard-copy records or the partially complete collection of PCZ birth and death records in PIERS.  *See* Ballard Decl. ¶¶ 18-19, 25; Westmark Decl. ¶¶ 7, 10.

But even if one were to require more for something to meet the definition of "creating" a new record from a database system, the Department would meet the test here as it has established that creating the record requested by Plaintiffs would be an onerous undertaking indeed.  To understand why, it is important to note that running a search on the PIERS application for all existing PCZ birth and death records, even if it were possible, would not yield the requested index for at least two reasons other than those discussed above.  First, a search on the PIERS application "yields [only] up to a certain number of results beyond which no further results are shown even if they fit the criterion used."  Ballard 2d Decl. ¶ 19.  Second, "there is an imperfect match of the data in PIERS and the paper records for the PCZ birth records and the PCZ death records," *id.* ¶ 17, because the Department "abandoned" its effort to digitize PCZ birth and death records midway through and "decided to preserve them in paper form instead."  Ballard Decl.

¶ 21. Consequently, a broader PIERS search for the relevant PCZ birth and death records would yield a limited — that is, incomplete — set of results, pulled from an already-incomplete set of digitized records. This means that, in order to fulfill Plaintiffs' request for an index, the Department would have to run hundreds of PIERS searches, verify the results by cross-checking them with the physical index cards, stitch each incomplete list of search results together, and then identify and add any non-digitized PCZ birth and death records. *See Nat'l Sec. Counselors*, 898 F. Supp. 2d at 271 ("[P]roducing a *listing* of database search results . . . is different than producing particular points of data . . . because a particular listing or index of the contents of a database would not necessarily have existed prior to a given FOIA request."). Alternatively, the Department would have to manually build "an inventory of the Department's PCZ records . . . from the [95,200] paper index cards," a process that would take years to complete. Westmark Decl. ¶ 14. Either way, the Department is "not expected," let alone required, "to take [such] extraordinary measures" in order to fulfill a FOIA request. *Garcia*, 181 F. Supp. 2d at 368.

Plaintiffs rely heavily on *ACLU Immigrants' Rights Project* in arguing that the Department "should not be permitted to allow technical restrictions of its own design to be the basis for withholding otherwise-available records." Pls.' Reply 4; *see id.* at 6; Pls.' Opp'n 11-12. But that case is distinguishable. There, the Second Circuit held that FOIA required Immigration and Customs Enforcement ("ICE") to apply "codes or some form of programming to retrieve [requested] information" from its databases in a way that would permit the ACLU to track individual non-citizens across those databases, as doing so would "not amount to the creation of records." 58 F.4th at 653; *see also Nat'l Sec. Counselors*, 898 F. Supp. 2d at 270 ("[S]orting a pre-existing database of information to make information intelligible does not involve the creation of a new record . . . . Sorting a database by a particular data field (*e.g.* date, category,

title) is essentially 'the application of codes or some form of programming,' and thus does not involve creating new records." (quoting H.R. Rep. 104–795, at 22 (1996)).  Critically, however, ICE had acknowledged that it had the "ability to track a single individual across the various stages of immigration proceedings" and that, "although ICE stores immigration data by event, it can, and on an ad hoc basis does, access that information in a person-centric manner *in the regular course of agency business*."  *ACLU Immigrants' Rts. Project*, 58 F.4th at 655, 658 (emphasis added).  Here, by contrast, the Department has shown that it does not have a similar ability to pull an index of PCZ birth and death records from PIERS.

Plaintiffs' sole remaining contention is that fear of inaccurate data does not justify the Department's refusal to generate an index.  *See* Pls.' Opp'n 14.  But this contention misses the mark for several reasons.  First, it erroneously assumes that PIERS can, in the first place, generate a comprehensive list of PCZ birth and death records, whether accurate or not.  Second, the problem with any PIERS-generated list is not only that the PCZ data might be inaccurate; it is also that, depending on the way that the list was compiled, it could contain non-PCZ data — which Plaintiffs did not request — as "there could be multiple PRISM numbers associated with a recordholder, who could have a PCZ record in addition to any number of passport records."  Westmark Decl. ¶ 13.[1]  Plaintiffs' effort to equate withholding a computer-generated list that surpasses the scope of their request with agency decisions to withhold a requested report or data set on account of objective errors within those documents is thus without merit.  *See* Pls.' Opp'n 14 (discussing *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1437 (D.C. Cir.

---

[1]      The problem, therefore, is not just that any PIERS-generated list might "errantly commingle[] [non-FOIA-exempt records] with exempt records."  Pls.' Opp'n 14 (quoting *Reclaim the Records v. Dep't of Veterans Affairs*, No. 18-CV-8449 (PAE), 2020 WL 1435220, at *21-22 (S.D.N.Y. Mar. 24, 2020)).  It is that any such list might include non-requested data, some of which may contain sensitive personal information not subject to disclosure.

1992) and *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 923 (9th Cir. 1992)).  So too is Plaintiffs' argument that the Department should release at least those "names associated with any records that *were* digitized."  Pls.' Reply 5.

## CONCLUSION

In conclusion, the Department establishes through Ballard's and Westmark's declarations that it conducted an adequate search for the requested index and that fulfilling Plaintiffs' request would require the creation of a new document, which FOIA does not require.  At bottom, Plaintiffs' arguments to the contrary are nothing more than "purely speculative claims about the existence and discoverability of other documents," which is not enough.  *Grand Cent. P'ship*, 166 F.3d at 489.  It follows that the Department's motion for summary judgment must be and is GRANTED, and Plaintiffs' cross-motion for summary judgment must be and is DENIED.

The Clerk of Court is directed to terminate ECF Nos. 21 and 35, to enter judgment in the Department's favor, and to close the case.

SO ORDERED.

Dated: August 7, 2024
New York, New York

_____
JESSE M. FURMAN
United States District Judge